

**IT IS ORDERED as set forth below:**

**Date:  January 27, 2017**
_____

**W. Homer Drake**
**U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | | |
|---|---|---|
| **IN THE MATTER OF:** | : | **CASE NUMBERS** |
| | : | |
| HIGH-TOP HOLDINGS, INC., | : | 16-10022-WHD |
| _____ | : | |
| | : | |
| HIGH-TOP HOLDINGS, INC., | : | ADVERSARY PROCEEDING |
|     Plaintiff, | : | NO. 16-1007-WHD |
| | : | |
|     v. | : | |
| | : | |
| RREF II BB ACQUISITIONS, LLC, | : | |
| RREF II BB-GA, LLC, and 16 WEST | : | |
| HOLDINGS, LLC, | : | |
|     Defendants. | : | |
| _____ | : | |
| | : | |
| HIGH-TOP HOLDINGS, INC., | : | ADVERSARY PROCEEDING |
|     Plaintiff, | : | NO. 16-1008-WHD |
| | : | |
|     v. | : | |
| | : | |
| RREF II BB ACQUISITIONS, LLC, | : | |
| MAGY-J, INC., FOURSOME, LLC, | : | |
| and ROBERT C. PERRY, JR., | : | |
|     Defendants. | : | |

_____  :
                             :
HIGH-TOP HOLDINGS, INC.,     :    ADVERSARY PROCEEDING
        Plaintiff,           :    NO. 16-1010-WHD
                             :
        v.                   :
                             :
RREF II BB ACQUISITIONS, LLC :
and CARMEL, LLC,             :
        Defendants.          :
_____  :
                             :
HIGH-TOP HOLDINGS, INC.,     :    ADVERSARY PROCEEDING
        Plaintiff,           :    NO. 16-1011-WHD
                             :
        v.                   :
                             :
RREF II BB ACQUISITIONS, LLC,:
DEBBIE TRUST, and SUSIE TRUST,:
        Defendants.          :
_____  :
                             :
HIGH-TOP HOLDINGS, INC.,     :    ADVERSARY PROCEEDING
        Plaintiff,           :    NO. 16-1012-WHD
                             :
        v.                   :
                             :
RREF II BB ACQUISITIONS, LLC :    IN PROCEEDINGS UNDER
and CLARA CO.,               :    CHAPTER 7 OF THE
        Defendants.          :    BANKRUPTCY CODE

## **ORDER**

Before the Court are the Motions for Summary Judgment filed by RREF II

BB Acquisitions, LLC (hereinafter "Acquisitions") and RREF II BB-GA, LLC

(hereinafter "BB-GA" and, collectively with Acquisitions, the "RREF Entities") in

the above-styled adversary proceedings.

In these adversary proceedings, High-Top Holdings, Inc. (hereinafter the "Debtor") names the RREF Entities and at least one other entity[1] as defendants. Count I of each complaint, as well as counterclaims/crossclaims filed by all but one of the non-RREF defendants, seek a determination of the validity and extent of a lien held by BB-GA on certain properties. The Debtor asserts that the lien is invalid and that, even if it is valid, the properties to which the lien would attach are subject to equitable interests held by other entities. In adversary proceeding 16-1007, the Debtor also alleges that a deed to secure debt is invalid (as part of Count I), and brings claims against Acquisitions for breach of contract (Count II), unjust enrichment (Count III), fraud in the inducement (Count IV), punitive damages (Count V), and attorney's fees and costs (Count VI), all arising from alleged pre-petition conduct.

## Jurisdiction and Authority

The Court finds that it has subject matter jurisdiction over the matters raised in these adversary proceedings. *See* 28 U.S.C. §§ 157(a), 1334. The Court also finds that Count I of each complaint and the counterclaims/crossclaims seeking a determination of the validity and extent of liens are core proceedings, subject to final determination by this Court. *See* 28 U.S.C. § 157(b)(2)(A), (K).

---

[1] The other entities are as follows: 16 West Holdings, LLC, MAGY-J, Inc., Foursome, LLC, Robert C. Perry, Jr., Carmel, LLC, Debbie Trust, Susie Trust, and Clara Co. The Court will refer to these entities, apart from Mr. Perry, as the "Jackson Entities."

2

However, the Court finds that Counts II, III, IV, V, and VI of adversary proceeding 16-1007 are non-core proceedings, as they do "not involve a right created by federal bankruptcy law, and [they are] not [proceedings] that would arise only in bankruptcy." *See Anderson 2000, Inc. v. Greenwich Ins. Co. (In re Anderson 2000, Inc.)*, 2007 WL 7142578, at *8 (Bankr. N.D. Ga. Oct. 28, 2007) (Drake, J.) (quoting *The Whiting-Turner Contracting Co. v. Elec. Machinery Enters., Inc. (In re Elec. Machinery Enters., Inc.)*, 479 F.3d 791, 798 (11th Cir. 2007)); *see also Giuliano v. Genesis Fin. Solutions, Inc. (In re Axiant, LLC)*, 2012 WL 5614588, at *1 (Bankr. D. Del. Nov. 15, 2012) ("[B]reach of contract and unjust enrichment claims are not core proceedings."). Consequently, though the Court may "hear" those proceedings, it "may only 'submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district court." *Id.* (quoting )). 28 U.S.C. § 157(c)(1)). Nevertheless, should the Court conclude that final judgment is appropriate, the parties may consent to the entry of that judgment. *See* 28 U.S.C. § 157(c)(2). Therefore, if necessary, "the Court will allow the parties an opportunity to do so prior to the Court's submission of proposed findings of fact and conclusions of law to the District Court." *Id.*

## Background

A. Pre-Bankruptcy

On August 8, 2004, the Debtor executed a promissory note (hereinafter "Note 1") payable to Main Street Bank in the amount of $876,581.  Note 1 was secured by a deed to secure debt (hereinafter "DSD-1") encumbering property known as 1710 Newnan Road in Spalding County, Georgia (hereinafter the "Newnan Road Property").

On May 24, 2007, Holiday Investments, Inc. (hereinafter "Holiday") executed a promissory note (hereinafter "Note 3") payable to Branch Banking & Trust Co. in the principal amount of $709,775.23.  Note 3 was likewise secured by a deed to secure debt (hereinafter "DSD-3") encumbering the Newnan Road Property.

On March 26, 2013, Note 1 and Note 3 were assigned to Acquisitions, along with DSD-1 and DSD-3.  In April of 2013, Acquisitions, the Debtor, and Holiday entered into an agreement (hereinafter the "Pre-Negotiation Agreement") containing a provision requiring all modifications to any agreement or contract the parties entered into to be in writing and signed by Acquisitions and all other necessary parties.

On May 22, 2013, Acquisitions and the Debtor executed an agreement (hereinafter the "Letter Agreement").   The header of the Letter Agreement

4

references the loan "made by Branch Banking & Trust Company to High Top Holdings, Inc….in the original principal amount of $876,581." The Letter Agreement calls for the Debtor to sell the Newnan Road Property for no less than $478,784.35 (which the RREF Entities assert was the payoff amount on Note 1 at the time of the Agreement). That amount would then be paid to Acquisitions, who would then "promptly deliver to [the Debtor] a recordable release of the Property from the lien of the Security Instrument." The Letter Agreement is signed by Michael Jackson, currently the Debtor's Chief Financial Officer, as the "Manager" of the Debtor (which is misidentified in the signature block as "High Top Holdings, LLC") and by Michael Jackson and Japeth Jackson, who was a principal of the Debtor, as guarantors. Holiday was not a party to the agreement.

On May 30, 2013, the Debtor, after acquiring the funds through a loan from Bank of the Ozarks, paid Acquisitions $478,784.35. Subsequently, Acquisitions released DSD-1.

On September 27, 2013, Acquisitions filed suit to enforce Note 3 in the Lamar County Superior Court (hereinafter the "Lamar Action") against Holiday, the Debtor, Michael Jackson, and C. Richard Morrow. In April of 2014, a settlement agreement (hereinafter the "Settlement Agreement") was entered into. As in the Letter Agreement, the Settlement Agreement does not include the Debtor's proper name but references "High-Top Holdings, LLC."

5

In addition to other terms, the Settlement Agreement contained a provision whereby the parties identified as the defendants agreed to

> release and forever discharge [Acquisitions]…from any and all claims, actions, causes of actions, suits, demands, complaints, and obligations, whether in law or in equity, whether known to them or unknown, whether *ex contractu* or *ex delicto*, for damages of every kind, character or description, costs, expenses, compensation, punitive damages, exemplary damages, consequential damages, or any other thing whatsoever, whether these damages or losses are known, unknown, foreseen, unforeseen, patent or latent from the beginning of time through and including the effective date of this Agreement.

The Settlement Agreement was signed by Michael Jackson in his individual capacity, in his capacity as president of Holiday, and in his capacity as president of "High-Top Holdings, LLC."

On April 10, 2014, the Superior Court entered a consent judgment (hereinafter the "Lamar Judgment") against Holiday, the Debtor, Michael Jackson, and C. Richard Morrow, jointly and severally, in the amount of $607,360.23 plus interest and attorney's fees.  Scott Mayfield, identified as the attorney for the defendants, and Michael Jackson (in his individual capacity and as the signatory for Holiday and the Debtor) both signed their consent to the Lamar Judgment.

On February 25, 2015, Acquisitions filed a FiFa in Lamar County, and on March 9, 2015, filed one in Spalding County.  Through these filings, Acquisitions acquired judgment liens against the Debtor's properties in those counties.  On October 28, 2015, Acquisitions transferred its interest to BB-GA.

B. Bankruptcy and Adversary Proceedings

The Debtor filed its petition under Chapter 11 on January 4, 2016. On March 29, 2016, the Debtor filed a complaint against the RREF Entities and 16 West Holdings, LLC (hereinafter "16 West"), initiating adversary proceeding 16-1007. The complaint alleged that Acquisitions had wrongfully failed to release DSD-3 in addition to DSD-1 on receipt of the $478,784.35 from the Debtor. Citing this alleged failure, the Debtor asserted a claim that DSD-3 should not attach to the Newnan Road Property. The Debtor also made claims for breach of contract, unjust enrichment, fraud in the inducement, punitive damages, and attorney's fees and expenses. Additionally, the Debtor maintained that the Lamar Judgment and the Settlement Agreement were invalid, that the Debtor had not been a party to either, and that, therefore, the RREF Entities did not hold a valid judgment lien on the Debtor's property. The Debtor also asserted that even if the RREF Entities held a valid judgment lien, that lien should not attach to the Newnan Road Property because, though the Debtor holds legal title to the Newnan Road Property, 16 West holds equitable title.

Less than a week later, on April 5, 2016, the Debtor initiated four more adversary proceedings, all alleging that any lien held by the RREF Entities is invalid and that equitable title to a property or properties in Spalding County to which the Debtor holds legal title is held by some other entity or entities:

7

- AP 16-1008: 4183 Old Atlanta Road—equitable title held by MAGY-J, Inc., which is owned by Foursome, LLC
- AP 16-1010: 2547 Old Atlanta Road and 4180 Old Atlanta Road—equitable title held by Carmel, LLC
- AP 16-1011: 76 acres on McIntosh Road—equitable title held by Debbie Trust and Susie Trust
- AP 16-1012: 15 Oak Street—equitable title held by Clara Co.

The complaints in each of these proceedings (as amended) name at least the RREF Entities and the alleged equitable owner as defendants. These alleged equitable owners, including 16 West, (hereinafter the "Jackson Entities"), all of which are affiliated with members of the family of Japeth Jackson[2] and managed by Michael Jackson, have all filed counterclaims/crossclaims in these proceedings against the Debtor and the RREF Entities, asserting their equitable interests in the subject properties.

On October 12, 2016, the RREF Entities filed a motion in the Debtor's bankruptcy case for the appointment of a Chapter 11 Trustee. In support of the motion, the RREF Entities noted that the Jackson Entities are all either directly or indirectly owned by members of the Jackson family, and are all controlled by Michael Jackson. The RREF Entities argued that Michael Jackson's positions with the Debtor and the Jackson Entities made it impossible for him to manage the Debtor's affairs impartially. As the most substantial act taken in the Debtor's

---

[2] For example, MAGY-J, Inc., is owned by Foursome, LLC, which in turn is owned by four trusts of which the children of Japeth Jackson are the beneficiaries.

bankruptcy case to that point had been the filing of these adversary proceedings, the RREF Entities concluded that the appointment of a trustee was necessary to address the inherent conflicts caused by this self-dealing.

The Court agreed with the RREF Entities, and granted the motion. On November 16, 2016, the United States Trustee appointed James G. Baker (hereinafter the "Trustee") as trustee, and on November 17, 2016, the Court approved his appointment.

On November 22, 2016, the RREF Entities filed a motion for summary judgment in each adversary proceeding. The Jackson Entities have filed responses, and the Trustee has filed responses admitting the facts as stated in the statements of facts filed with the RREF Entities' motions.

On January 26, 2017, on motion of the Trustee, the Debtor's bankruptcy case was converted to Chapter 7.[3]

---

[3] As this case has been converted to Chapter 7, the Debtor is no longer a "debtor in possession" and therefore has no more standing to bring these claims. *See In re Upshur*, 317 B.R. 446, 452 (Bankr. N.D. Ga. 2004) (Bihary, J.) ("[Property of the estate] includes causes of actions belonging to a debtor at the commencement of the case."); *Davis v. Victor Warren Props., Inc. (In re Davis)*, 216 B.R. 898, 903 (Bankr. N.D. Ga. 1997) (Massey, J.) ("The power to prosecute claims belonging to the estate is not one entrusted to the debtor, at least if the claims are not generated and handled in the ordinary course of business operated by a self-employed debtor under section 1304(b)."). However, as the Trustee has given no indication of withdrawing these claims, and as the Trustee's "rights and powers are limited to those held by the Debtor as of the commencement of the case," *Sheehan v. Warner (In re Warner)*, 480 B.R. 641, 656 (Bankr. N.D. W. Va. 2012), it is still necessary to address the instant motions. Any reference in this Order to the Debtor's

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see also* Fed. R. Bankr. P. 7056 (incorporating Rule 56).  "The moving party bears the initial burden of establishing that no genuine factual issue exists."  *First Nat'l Bank of Griffin v. Wyatt-Frizzell (In re Frizzell)*, 2006 WL 6589889, at *2 (Bankr. N.D. Ga. Aug. 8, 2006) (Drake, J.); *accord Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the movant has met this burden, the burden shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark*, 929 F.2d at 608.  In making their cases, neither party can rely on conclusory allegations, but must support their allegations with facts from the record.  *See* Fed. R. Civ. P. 56(c), (e); *see also Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value."); *In re Frizzell*, 2006 WL 6589889, at *2 ("The movant must point to the pleadings, discovery responses or supporting affidavits which tend to show the absence of a genuine issue of material fact.")

---

authority to take certain actions should be considered binding on the Trustee as well.

It is important to note that only *genuine* disputes of *material* facts will preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."). In that regard, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Kidd v. Student Loan Xpress, Inc. (In re Kidd)*, 2012 WL 1820816, at *2 (Bankr. N.D. Ga. Apr. 2, 2012) (Diehl, J.). A fact is material if its truth or falsity would affect the outcome of the case. *See In re Kidd*, 2012 WL 1820816, at *2. Materiality is a key consideration, as "[a]n evidentiary difference as to an immaterial matter will not bar a summary judgment." *Robbins v. Gould*, 278 F.2d 116, 119 (5th Cir. 1960). Similarly, if the party that will bear the burden of proof at trial fails to show a genuine issue as to an essential element of its claim, that renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, a court must not "weigh the evidence and determine the truth of the matter," but merely "determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. Additionally, the court should view all the evidence in the light most favorable to the non-movant. *E.g.*, *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th

Cir. 2012); *Bank of N. Ga. v. McDowell (In re McDowell)*, 497 B.R. 363, 368 (Bankr. N.D. Ga. 2013) (Drake, J.).  With these guiding principles in mind, the Court turns to the issues in the instant motions.

### Discussion

In their motions, the RREF Entities assert four grounds that they believe entitle them to summary judgment on all of the claims brought by the Debtor and the Jackson Entities: (A) the Lamar Judgment is valid and is not subject to attack in this Court; (B) the Jackson Entities do not hold equitable interests in the Debtor's property; (C) the Debtor is barred from bringing its claims against Acquisitions by reason of a general release; and (D) the Debtor's claims arising from Acquisitions failure to release DSD-3 are unfounded because Acquisitions never agreed to release DSD-3.   The Court will address each of these in turn.

A. Is the Lamar Judgment Subject to Attack in This Court, and, If So, Is It Valid?

In the Debtor's complaints, it asserts that the Lamar Judgment is not valid and enforceable against the Debtor because the Debtor was not a party to that judgment.  In their motions for summary judgment, the RREF Entities argue that the Lamar Judgment is enforceable against the Debtor because it was signed by the Debtor's counsel of record and by Michael Jackson.  The RREF Entities also assert that this sort of collateral attack on the Lamar Judgment is barred by the *Rooker-Feldman* doctrine.

12

In resolving these motions, the Court need not consider whether Michael Jackson and the Debtor's counsel had authority to bind the Debtor to the Lamar Judgment, as the Court agrees with the RREF Entities that the Debtor may not collaterally attack the Lamar Judgment in this Court.

Georgia law allows collateral attacks "in any court by any person," but only when a judgment is "void on its face." O.C.G.A. § 9-11-60(a). The only scenario in which a judgment is void on its face is one in which the rendering court lacked jurisdiction. *See Rice v. Champion Bldgs., Inc.*, 654 S.E.2d 390, 392 (Ga. Ct. App. 2007). Here, there is no indication that the Lamar County Superior Court lacked jurisdiction (either personal or subject matter) in the Lamar Action, and therefore the judgment is not void on its face and not subject to attack in this Court. *See* O.C.G.A. § 9-11-60(b) ("Judgments may be attacked by motion only in the court of rendition."); *see also Salim Merchant I v. Ultra Grp. of Cos., Inc. (In re Al-Karim, Inc.)*, 529 B.R. 366, 373 (Bankr. N.D. Ga. 2015) (Hagenau, J.) ("If the judgment is not void on its face, the judgment may only be attacked in the court that rendered the judgment, by a motion for new trial or motion to set aside.").

Consideration of the *Rooker-Feldman* doctrine also supports the Court's conclusion. Put simply, "[t]he *Rooker-Feldman* doctrine states that federal district courts have 'no authority to review final judgments of a state court.'" *Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1072 (11th Cir. 2013) (quoting

13

*Nicholson v. Shafe*, 558 F.3d 1266, 1271 (11th Cir. 2009)).   Because the Bankruptcy Courts are an arm of the District Courts, this prohibition applies to them as well.  *See Bryant v. Archibald (In re Bryant)*, 2014 WL 2800818, at *2 (Bankr. N.D. Ga. June 16, 2014) (Hagenau, J.).  Consequently, this Court, along with all other lower federal courts, is "expected to respect state court judgments." *In re Al-Karim*, 529 B.R. at 373.  For these reasons, the Court will not disturb the Lamar Judgment.  If the Debtor wishes to obtain relief from the Lamar Judgment's terms, it must seek that relief elsewhere.  *See id.* at 373.

As the Debtor is barred from challenging the Lamar Judgment in this Court, there can be no genuine issue of material fact in these proceedings on the question of the Lamar Judgment's validity, and the RREF Entities are entitled to judgment as a matter of law to the extent that Count I of adversary proceedings 16-1007, 16-1008, 16-1010, 16-1011, and 16-1012 and the related counterclaims/crossclaims of the Jackson Entities assert the invalidity of the Lamar Judgment.

B. Do the Jackson Entities Have Equitable Interests in the Properties?

The Debtor and the Jackson Entities assert that the Jackson Entities hold equitable title to properties in which legal title is held by the Debtor.  They base this claim on two allegations.  First, they maintain that the Jackson Entities own the equitable interest in the properties because they pay the debt service and expenses on the properties.  Second, the Jackson Entities claim that it was always

14

the intention and understanding of the Debtor and the Jackson Entities that the Jackson Entities would own the properties, asserting that the Debtor obtained the money to purchase the property and holds legal title only as a matter of convenience. If the Jackson Entities hold equitable title, BB-GA's lien would not reach the properties, nor would the properties be considered property of the Debtor's bankruptcy estate. *See generally HSBC Mortg. Servs., Inc. v. Pettigrew (In re Southstar Funding, LLC)*, 2008 WL 7874263, at *3 (Bankr. N.D. Ga. Oct. 6, 2008) (Bonapfel, J.); *Shivers v. Hunnicut*, 140 S.E.2d 872, 874 (Ga. 1965).

The RREF Entities contest these allegations. They argue that there is no evidence that the Jackson Entities paid anything for the properties at or before the time these properties were purchased, and that the mere intent to create a trust is not enough to create an equitable interest. Therefore, the RREF Entities assert that the Jackson Entities cannot have an interest in the properties.

It is well-established that state law determines interests in property. *E.g.*, *Baker v. United States*, 440 U.S. 48, 55 (1979); *Witko v. Menotte (In re Witko)*, 374 F.3d 1040, 1043 (11th Cir. 2004); *see also Raborn v. Menotte (In re Raborn)*, 470 F.3d 1319, 1324 (11th Cir. 2006) (per curiam) (certifying questions concerning trusts to the Florida Supreme Court). Thus, to answer whether the Jackson Entities have equitable interests in the properties in Spalding County, it is necessary to consider Georgia law.

There are two types of trusts: express and implied.  Express trusts are "created purposely by a settlor, who transfers his or her own property to a trustee for the purposes that are spelled out in the trust instrument."  MARY F. RADFORD, GEORGIA TRUSTS AND TRUSTEES § 1:6 (2016-2017 ed.).  On the other hand, "[a]n 'implied trust' is a legal fiction that is imposed or recognized by a court acting in equity."  *Id.*  An express trust requires that the trust be established by a written instrument.  *See* O.C.G.A. § 53-12-20(a); *In re Southstar Funding, LLC*, 2008 WL 7874263, at *7.  Here, no party contends that there is a writing establishing the Jackson Entities' interests, so there can be no express trust.  Consequently, the Court's inquiry will focus on implied trusts.

Implied trusts are further broken into two categories: constructive trusts and resulting trusts.  *See Ansley v. Raczka-Long*, 744 S.E.2d 55, 58 (Ga. 2013).  The Georgia Code defines a constructive trust as "a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity."  O.C.G.A. § 53-12-132(a).  "A constructive trust is a remedy, not an independent cause of action, whereby property may be recovered from one who wrongfully holds it."  *In re Cotton*, 2004 WL 2983350, at *3 (Bankr. N.D. Ga. Feb. 17, 2004) (Bonapfel, J.); *accord Wallace v. McFarland (In re McFarland)*, 619 F. App'x 962, 973 (11th Cir. 2015)

16

(per curiam).  In the instant proceedings, neither the Debtor nor the Jackson Entities have alleged any wrongdoing on the part of the Debtor or any entitlement to a constructive trust.  As a result, the Court's focus narrows to considering resulting trusts only.  *See Hall v. Higgison*, 149 S.E.2d 808, 810 (Ga. 1966) ("There being no allegation of fraud in the petition before us, this opinion will be limited to a consideration of the resulting trust only."); *Rosado v. Rosado*, 662 S.E.2d 761, 763 (Ga. Ct. App. 2008) (considering only resulting trusts where "[t]here [was] no claim in [the] litigation that the implied trust the plaintiff [sought] to establish…[was] a 'constructive' trust").

There are three circumstances in which a resulting trust arises: "(1) an express [or implied] trust is created but fails for any reason; (2) a trust is fully performed without exhausting all the trust property; and (3) a purchase money resulting trust is established."  *Ansley*, 744 S.E.2d at 58 (alteration in original).  In these proceedings, there is no failed or performed trust.  Therefore, if a resulting trust exists, it must be a purchase money resulting trust.

The Georgia Code states, "A purchase money resulting trust is a resulting trust implied for the benefit of the person paying consideration for the transfer to another person of legal title to real or personal property."  O.C.G.A. § 53-12-131(a).  Put another way, "An implied trust results from the fact that one person's money has been invested in land and the conveyance taken in the name of

17

another."  *Shivers*, 140 S.E.2d at 874 (quoting *Hudson v. Evans*, 32 S.E.2d 793, 775 (Ga. 1945)).  In an action to prove the existence of a purchase money resulting trust, the alleged beneficiary bears the burden of proof by clear and convincing evidence.  *See Freeman v. Saxton*, 255 S.E.2d 28, 30 (Ga. 1979); *accord In re McFarland*, 619 F. App'x at 969.  If an alleged beneficiary shows that it has paid consideration for the property, a presumption arises "in favor of a resulting trust, but such presumption shall be rebuttable by a preponderance of the evidence." O.C.G.A. § 53-12-131(b).[4]

There are two situations in which a purchase money resulting trust may arise: (1) "the purchase-price was paid by the beneficiary of the trust at or before the time the conveyance was made"; or (2) it is shown, "other than by a void parol agreement, that it was the intent and purpose of the parties *at the time the conveyance was made* that the one claiming the benefit of the trust should pay the

---

[4] The Georgia Code also provides that a presumption arises *against* a resulting trust in situations in which "the payor of consideration and transferee of the property as provided in subsection (a) of this Code section are husband and wife, parent and child, or siblings."  O.C.G.A. § 53-12-131(c).  In their briefs in support of their motions, the RREF Entities argue that the Court should apply this presumption because the Debtor and the Jackson Entities are all controlled and owned by members of the same family.  While the Court acknowledges the interrelatedness of the Debtor and the Jackson Entities, the statute expressly requires a husband and wife, parent and child, or sibling and sibling relationship.  Despite the consanguinity of the individuals standing behind the "corporate veils" of the Debtor and the Jackson Entities, these corporations, limited liability companies, and trusts are not husband and wife, parent and child, or sibling and sibling. Therefore, the Court will not apply this presumption.

purchase-money in conformity with such original intent and purpose of the parties." *Thompson v. Bearden*, 453 S.E.2d 20, 21 (Ga. 1995) (quoting *Loggins v. Daves*, 40 S.E.2d 520, 521 (Ga. 1946)).

In considering whether a purchase money resulting trust arose in this case, the Court is guided by a recent decision of the Eleventh Circuit, *Wallace v. McFarland (In re McFarland)*, 619 F. App'x 962 (11th Cir. 2015). In that case, a couple purchased real property for $15,000. $5,000 came as a loan from the wife's father, and the remaining $10,000 was financed by a bank. Both loans were then paid off from a joint bank account. Title to the property was exclusively in the husband, but the couple stated that "it was always their intention that the Property be jointly owned." *In re McFarland*, 619 F. App'x at 965.

Analyzing the issue of whether a purchase money resulting trust had arisen in favor of the wife, the Eleventh Circuit first noted that the couple's intent to own the property jointly was not sufficient to form a purchase money resulting trust. *Id.* at 969. Nonetheless, the court concluded that, despite the fact that the wife had not provided any consideration for the purchase of the property at the time it was conveyed to the husband, the wife's contributions to the couple's joint bank account and the subsequent payment of the purchase loans from that account

constituted payments sufficient to represent consideration for the purpose of a purchase money resulting trust.  *Id.* at 969-70.[5]

There are similar facts in the instant proceedings.  The Jackson Entities admit that the properties were all purchased by the Debtor and that they provided no funds at the time of the conveyance toward the purchase of the properties. Nevertheless, they have presented evidence by way of declarations that they have paid the debt service and expenses related to the properties.  Though these payments were made subsequent to the actual conveyance of the properties, the Court, following the Eleventh Circuit's interpretation of Georgia law in *In re McFarland* and viewing the declarations in the light most favorable to the non-movant Jackson Entities, finds that this is some evidence of payment of consideration.

This evidence that the Jackson Entities paid consideration for the conveyance of the properties to the Debtor, if true, would cause a presumption to arise that the Debtor and the Jackson Entities intended to form a purchase money resulting trust, which the RREF Entities may overcome by a preponderance of the evidence.  *See* O.C.G.A. § 53-12-131(b).  Consequently, particularly as the Court

---

[5] Despite this finding, the Eleventh Circuit ultimately concluded that the couple failed to rebut the presumption that the payments were a gift to the husband, and therefore did not show by clear and convincing evidence that they intended to create a resulting trust.  *In re McFarland*, 619 F. App'x 971-72; *see also* Note 4, *supra*.

is not permitted on a motion for summary judgment to weigh and balance evidence, the Court finds there is a genuine question as to whether purchase money resulting trusts have arisen in these adversary proceedings is best left for resolution at trial. *See Liberty Lobby*, 477 U.S. at 249 ("Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that a trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.").

C. Are the Debtor's Claims Against Acquisitions Barred by the General Release in the Settlement Agreement?

In their motions for summary judgment, the RREF Entities assert that the Debtor is barred from bringing its claims against the RREF Entities by the release language that was part of the Settlement Agreement in the Lamar Action. On its part, the Debtor asserts that it is not bound by the Settlement Agreement, as it was not a party to the Settlement Agreement and it did not authorize any party to sign or enter into the Settlement Agreement on its behalf.

Under Georgia law, which the Settlement Agreement identifies as the controlling law for its interpretation, settlement agreements are interpreted like contracts. *Safe Shield Workwear, LLC v. Shubee, Inc.*, 675 S.E.2d 249, 252 (Ga. Ct. App. 2009). Additionally, "[t]he issues of contract construction and enforceability are generally questions of law for a court to resolve." *Precision*

*Planning, Inc. v. Richmark Communities, Inc.*, 679 S.E.2d 43, 45 (Ga. Ct. App. 2009); *see also Sakas v. Jessee*, 415 S.E.2d 670, 672-73 (Ga. Ct. App. 1992) ("Construction of written contracts, even if they are ambiguous in some respect, is a matter for the court, and no jury question arises unless after application of applicable rules of construction the ambiguity remains."). Therefore, whether the Settlement Agreement's terms bar the Debtor from pursuing claims against the RREF Entities is a question of law for this Court to resolve, and thus a question ripe for summary judgment.

"The cardinal rule of construction is to determine the intention of the parties." *Safe Shield Workwear, LLC*, 675 S.E.2d at 252 (quoting *UniFund Fin. Corp. v. Donaghue*, 653 S.E.2d 513, 515 (Ga. Ct. App. 2007)); *see also Barnett v. Platz*, 581 S.E.2d 682, 684 (Ga. Ct. App. 2003) ("A court must determine the meaning of a settlement agreement incorporated into a divorce decree according to the usual rules of construction, and the cardinal rule thereof is to ascertain the intention of the parties."). However, if a contract's terms are clear and unambiguous, those terms are the sole evidence of intent that a court may consider. *Barnett v. Platz*, 581 S.E.2d at 684; *see also Sofran Peachtree City, L.L.C. v. Peachtree City Holdings, L.L.C.*, 550 S.E.2d 429, 432 ("When the language of an agreement is plain and unambiguous, the court must afford its literal meaning, despite a party's contention that he understood the contract to mean something

22

else.").  This is a strict rule of construction—"no construction is…*even permissible* when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation."  *Darby v. Mathis*, 441 S.E.2d 905, 906 (Ga. Ct. App. 1994) (emphasis added) (quoting *Hopkins v. Hopkins*, 367 S.E.2d 825, 826 (Ga. Ct. App. 1988)).

Turning to the contractual language at issue here, the Settlement Agreement states as follows:

> By execution of this Agreement, the Defendants hereby release and forever discharge [Acquisitions], and [its] successors…from any and all claims, actions, causes of actions, suits, demands, complaints, and obligations, whether in law or in equity, whether known to them or unknown, whether *ex contractu* or *ex delicto*, for damages of every kind, character or description, costs, expenses, compensation, punitive damages, exemplary damages, consequential damages, or any other thing whatsoever, whether these damages or losses are known, unknown, foreseen, unforeseen, patent or latent from the beginning of time through and including the effective date of this Agreement.

The Court finds this language clear and unambiguous.  The agreement plainly states that the defendants release Acquisitions and its successors from "any and all claims [and] actions" arising "from the beginning of time through and including the effective date of the Agreement."  As the Debtor's claims concerning the non-release of DSD-3, including the claims for breach of contract, unjust enrichment, and fraud in the inducement, and its derivative claims for punitive damages and attorney's fees, all arose from conduct that pre-dates the Settlement Agreement, the

release, if effective against the Debtor, would bar the Debtor from bringing those claims.

Trying to avoid such an outcome, the Debtor has claimed that it was not a party to the Settlement Agreement, and for that reason is not bound by its terms. From the arguments contained in the parties' briefs, it appears that the Debtor alleges it was not a party to the Settlement Agreement because the Settlement Agreement refers to "High-Top Holdings, LLC" rather than the Debtor's proper name, "High-Top Holdings, Inc." The signature block of the Settlement Agreement also indicates "LLC" instead of "Inc."

"It is well established that any mistake in a contract, consisting of an unintentional act or omission, that is a clerical error, which in no way changes the contract or the relationship of the parties should not be permitted to defeat the clear intention of the parties." *Zakaria v. McElwaney*, 329 S.E.2d 310, 311-12 (Ga. Ct. App. 1985). Here, the evidence presented by the RREF Entities shows that the reference to "LLC" was a typographical error. The RREF Entities assert in their statements of facts that the reference was a mistake, and neither the Debtor nor the Jackson Entities contest that assertion. [6] Additionally, no party asserts that High-Top Holdings, LLC (if such an entity exists) was a party to the Lamar Action.

---

[6] The Jackson Entities' response to the assertion simply states, "Michael Jackson stated in the deposition regarding the purported mistake (LLC instead of Inc., a Pennsylvania Corporation) 'my lawyer didn't do it.'"

Consequently, the Court will not allow a typographical error to undo the clear intent of the parties.

Therefore, the release in the settlement agreement is binding and valid to bar the Debtor from bringing its claim that DSD-3 should not attach to the Newnan Road Property (Count I), as well as its claims for breach of contract (Count II), unjust enrichment (Count III), fraud in the inducement (Count IV), punitive damages (Count V), and expenses (Count VI). Thus, there can be no genuine issue of material fact on those claims, and summary judgment is appropriate.

D. Did Acquisitions Agree to Release DSD-3?

As the Debtor is barred from pursuing its claims based on Acquisitions alleged failure to release DSD-3, the Court need not address this ground of the RREF Entities' motions.

## Conclusion

In accordance with the foregoing, it is hereby **ORDERED** that the RREF Entities' Motions are **GRANTED IN PART AND DENIED IN PART**.

Summary Judgment is **GRANTED** to the RREF Entities on Count I of each of the Debtor's complaints and the counterclaims/crossclaims filed by the Jackson Entities except to the extent they allege that the Jackson Entities hold equitable interests in the properties.

The Court finds that summary judgment is appropriate on Counts II through VI of the Debtor's complaint in adversary proceeding 16-1007.  However, as the Court has concluded that these Counts constitute non-core proceedings, the Court must, absent the parties' consent to this Court's entry of a final judgment, submit proposed findings of fact and conclusions of law to the District Court.  Therefore, within fourteen (14) days of the entry of this Order, Acquisitions and the Trustee[7] shall file a notice with the Court indicating whether they consent or do not consent to the entry by this Court of a final judgment on Counts II through VI of the Debtor's complaint.  Any party who fails to file a notice will be deemed to have consented.  If all parties consent or are deemed to consent, the Court will enter judgment in accordance with this Order in adversary proceeding 16-1007 on Counts II through VI.  If any party does not consent, the Court will file with the District Court proposed findings of fact and conclusions of law regarding those Counts.

The Clerk is **DIRECTED** to serve this Order on the RREF Entities, the Debtor, the Trustee, the Jackson Entities, Robert C. Perry, and the U.S. Trustee.

**END OF DOCUMENT**

---

[7] The Court does not require the consent of the Debtor, as this case has been converted to Chapter 7.